## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **DELMA TERENZIO, as Personal** | : | |
| **Representative of the Estate of** | : | |
| **Joseph A. Terenzio,** | : | **Civil Action No.** |
| **THOMAS SULLIVAN, as Personal** | : | |
| **Representative of the Estate of** | : | |
| **John J. Sullivan,** | : | |
| **EDWARD POULIN, as Personal** | : | |
| **Representative of the Estate of** | : | |
| **Maurice C. Poulin,** | : | |
| **on behalf of themselves and others similarly** | : | |
| **situated,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **FRANCISCO URENA,** | : | |
| **MARYLOU SUDDERS,** | : | |
| **CHERYL LUSSIER POPPE,** | : | |
| **JOHN DOE 1, JANE DOE 1, JOHN DOE 2** | : | |
| **and JANE DOE 2,** | : | |
| **Defendants.** | : | |

## COMPLAINT AND JURY TRIAL DEMAND

## INTRODUCTION

This civil rights class action lawsuit arises out of: 1) the COVID-19-related deaths of at least thirty-one (31) military veterans who resided at the Soldiers' Home in Chelsea ('SHC") in 2020; 2) the injuries sustained by numerous veterans who contracted COVID-19 at the SHC in 2020; and 3) the harm sustained by numerous veterans who lived at the SHC from March 1, 2020 to the present as a result of unsanitary, unfit, and unacceptable living conditions. All of these veterans served their country with valor and distinction. Many of these veterans were highly decorated and had received awards, commendations and medals for their incredible bravery, courage, heroism and accomplishments serving their country during wartime.

The defendants were agents, servants, and employees of the Commonwealth of Massachusetts, including, Francisco Urena, Secretary of the Department of Veterans' Services, Marylou Sudders, Secretary of the Executive Office of Health and Human Services, Cheryl

Lussier Poppe, Superintendent of the SHC, John Doe 1 & 2 and Jane Doe 1 and 2. The defendants are sued in their individual capacities. These defendants who were recklessly and/or deliberately indifferent to the basic rights and needs of the veterans were under the care of the SHC in and after February of 2020. Specifically, the defendants, individually and collectively, failed to take timely or appropriate actions with respect to the deadly COVID-19 virus, failed to address or correct unsanitary, unfit, and unacceptable living conditions at the SHC, and demonstrated callous indifference to the rights of the veterans under the care of the SHC.

As a direct and proximate result of the defendants' acts and omissions, numerous veterans were inflicted with the COVID-19 virus and at least thirty-one (31) veterans suffered premature and preventable deaths. Additionally, numerous veterans experienced pain, suffering, and harm as a result of their exposure to the COVID-19 virus and/or unsanitary, unfit, and unacceptable living conditions at the SHC. The named plaintiffs' decedents and all members of this class action experienced unnecessary pain, suffering, loss, personal humiliation, mental anguish, and mental and emotional distress. The plaintiffs are entitled to be compensated under the Fourteenth Amendment and 42 U.S.C. § 1983 for the deprivation of their basic and constitutional rights with an award of compensatory and punitive damages.

The SHC is 139-bed long-term care facility and 305-bed domiciliary established in 1882. In or about 2020, the long-term care portion of the SHC was an "open-ward," skilled nursing facility. The residents were housed in large, open, dormitory-style rooms throughout the building.

The defendants were responsible for supervising and/or providing appropriate services to the veterans who lived or stayed at the SHC. The defendants knew or should have known that many of the veterans who lived at the SHC were elderly and were particularly vulnerable to viruses, including the COVID-19 virus, and/or unsanitary or unfit living conditions.

2726726.v1



*Joseph "Red" Terenzio*

In March of 2020, Mr. Joseph Terenzio was a resident of the Three-Center Unit (third floor unit) at the SHC and he had lived in the facility for approximately two years. Mr. Terenzio had served the United States of America as a Staff Sergeant with distinction and valor and had earned numerous awards, including, a good conduct medal, two Bronze Stars, three Purple Hearts and a Silver Star for his service in the Asiatic Pacific Theater Campaign during World War II and for saving twenty-seven (27) lives. He was a combat infantry rifleman who was wounded in action.



*John J. Sullivan*

Mr. John J. Sullivan was also a resident of the Three-Center Unit at the SHC in March of 2020.  He had lived at the facility for more than a decade. Mr. Sullivan came from a family of Navy veterans. His father served in the South Pacific during World War II and his younger brother served during the Vietnam War. In his family tradition, Mr. Sullivan also served his country with distinction and valor as a member of the United States Navy.  After he graduated from Needham High School, he enlisted in the Navy and then served as a 2nd Class Machinist Mate during the Vietnam War. Mr. Sullivan was proud of his service to the USA.



*Maurice C. Poulin*

Mr. Maurice Clement Poulin was also a resident of the SHC in March of 2020.  Mr. Poulin also served his country with distinction and valor in the United States Coast Guard for more than two decades.  His war time service was during WWII, where he participated in many major invasions begining in the European Theater in Sicily, Fedela, Moroco, Africa landing troops for General Patton's Army, then off to the Pacific Theater with invasions at Makin Island, the Marshall Islands, Kwajalein, Eniwetok, invasions in the Marianas, Guadacanal, Saipan, and invasions in the Philippines, Leyte Gulf, Luzon. After returning from war, while still on active duty, he participated in the Cuban missile crisis in November 1962, while officer in charge of a 82 ft patrol boat off the coast of Florida. He earned numerous awards and medals including the Navy Unit Commendation Ribbon, American Defense Service Medal, American Campaign Medal, US Coast Guard Good Conduct Medal with One Silver Star, the European-African-Middle Eastern Campaign Medal with Two Bronze Stars, the Asiatic-Pacific Campaign Medal with One Bronze Star and One Silver Star and the World War II Victory Medal.

2726726.v1

At all relevant times, Mr. Terenzio, Mr. Sullivan, Mr. Poulin and their family members expected that they would receive proper services and living conditions at the SHC. They also relied on the defendants to provide for their safety and to keep them free from unnecessary injury or harm.

In and after March of 2020, the defendants were obligated to protect, supervise and provide appropriate services and living conditions for the veterans who resided at the SHC. The defendants were deliberately and/or recklessly indifferent to the needs and constitutional rights of Mr. Terenzio, Mr. Sullivan, Mr. Poulin and their fellow veterans at the SHC. The defendants, individually and collectively, failed to take timely or appropriate actions with respect to the deadly and contagious COVID-19 virus, despite clearly established guidelines for handling contagious diseases, and demonstrated callous indifference to the rights of the veterans residing in the SHC in and after March 2020. The defendants also failed to address or correct unsanitary and/or unfit living conditions at the SHC. The defendants' reckless indifference included the following egregious and callous acts or omissions:

    a.    Failing to properly consider and respond to the risks associated with the COVID-19 virus;

    b.    Failing to adopt and/or implement appropriate protocols or procedures to address or mitigate the grave risks posed by the COVID-19 virus;

    c.    Failing to properly educate employees and residents of the SHC concerning the risks associated with the COVID-19 virus;

    d.    Failing to prevent or properly respond to an outbreak of the COVID-19 virus at the SHC;

    e.    Failing to take appropriate steps to prevent the spread of COVID-19 within the patient/resident population at the SHC;

    f.    Failing to ensure that the employees or staff of the SHC had appropriate PPE (including masks, gloves and gowns);

    g.    Failing to ensure that sick, ill or contagious employees or staff at the SHC were quarantined or denied admission to the SHC;

    h.    Allowing sick, ill or contagious employees or staff to continue to work at the SHC;

    i.    Failing to test or screen employees or staff working at the SHC;

    j.    Failing to properly test or screen visitors to the SHC;

    k.    Failing to ensure that sick, ill or contagious residents and/or family members of residents at SHC were quarantined or denied admission to the SHC;

    l.    Allowing sick, ill or contagious residents to live and sleep in close proximity to other residents at the SHC and have unrestricted access to their units;

    m.    Disregarding industry and/or governmental advice and recommendations, including, but not limited to, Center for Disease Control and Prevention (CDC) COVID-19 protocols and guidance;

5

n.    Forcing dementia residents to live and sleep in close proximity to other non-dementia residents at the SHC;

o.    Failing to implement or adopt appropriate infection control and/or crisis management procedures or protocols;

p.    Failing to ensure that there was adequate staffing at the SHC;

q.    Creating and maintaining an unsanitary, unfit, and unacceptable living conditions;

r.    Creating unsafe conditions of confinement for the veterans at the SHC;

s.    Failing to provide the veterans at SHC with minimally adequate services and living conditions; and

t.    Otherwise failing to ensure for the care, safety, and protection of the veterans residing at the SHC.

As a direct and proximate result of the acts, omissions and deliberate indifference of the defendants, Mr. Terenzio, Mr. Sullivan, Mr. Poulin and at least twenty-eight (28) of their fellow veterans died premature and preventable deaths from COVID-19. Additionally, numerous other veterans residing at the SHC were unnecessarily exposed to COVID-19, developed complications and were compelled to receive care and treatment for their conditions. Further, numerous other veterans residing at the SHC since March 2020 have suffered harm as a result of the unsanitary, unfit, and unacceptable living conditions at the SHC and/or the less than minimally adequate services at the SHC.

This class action is brought on behalf of the estates of Mr. Terenzio, Mr. Sullivan, Mr. Poulin and all other similarly situated veterans at the SHC who died as a result of COVID-19. It is also brought on behalf of the other veterans of the SHC who contracted COVID-19 and required care and treatment and/or experienced pain or suffering. It is also brought on behalf of the other veterans at the SHC who suffered harm as a result of unsanitary, unfit, and unacceptable living conditions at the SHC and/or the less than minimally adequate services at the SHC. Fairness and justice dictate that the plaintiffs and all members of this class action must receive adequate compensation for their losses, damages and injuries. The plaintiffs and all class members seek compensatory and punitive damages for the deprivation of the veterans' basic and constitutional rights.

## NATURE OF THE ACTION

1.    This action, brought under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983, exposes the acts, omissions and reckless indifference of the defendants with respect to their role in the management, supervision, care and treatment of the veteran residents of the SHC during the COVID-19 Pandemic.

2.    At all times material hereto, defendants knew, or should have known, about the risks associated with COVID-19, particularly with respect to the at-risk population in the SHC.

6

3.  The plaintiffs and the class members suffered injury, harm and loss as a direct result of defendants' conduct.

4.  The plaintiffs seek to certify one or more classes of similarly situated individuals and/or estates of individuals who contracted COVID-19 at the SHC in and after March 2020, and/or sustained injury or harm as a result of the exposure to COVID-19 and/or sustained injury or harm as a result of the unsanitary, unfit, and unacceptable living conditions at the SHC and/or the less than minimally adequate medical and nursing care at the SHC since March of 2020.

5.  This action seeks to compensate those who have already suffered damages caused by the defendants' acts or omissions.

6.  The central issue raised herein – whether defendants' deliberate, callous and/or reckless indifference caused the deaths of at least thirty-one (31) veterans and injury or harm to numerous other veterans– is common to the members of each proposed class. There is an economy to class treatment of this central question because its resolution has the potential to eliminate the need for repeated litigation related to the defendants' acts or omissions. For these reasons, certification of the class is necessary and appropriate.

## JURISDICTION AND VENUE

7.  Jurisdiction is proper in this Court as defendants have necessary minimum contacts with the state of Massachusetts. They reside in Massachusetts and worked in Massachusetts, therefore satisfying the requirements for personal jurisdiction articulated in *International Shoe v. Washington*, 326 U.S. 310 (1945).

8.  Jurisdiction is proper in this Court because the action arises under the laws of the United States, namely the Fourteenth Amendment of the United States Constitution and 14 U.S.C. § 1983 et seq. Jurisdiction is proper for all other causes of action not arising under the laws of the United States. 28 U.S.C. § 1367 provides for supplemental jurisdiction over any claim for which the Court does not have independent subject matter jurisdiction, where the claim is related to another claim for which the court does have independent jurisdiction.

9.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because at least one of the named plaintiffs resides in this District and some of the putative class members also reside in this District.

## **PARTIES**

10. Plaintiff, Delma A. Terenzio, is a resident of Revere, Massachusetts.  She brings this action as Personal Representative of the Estate of Joseph A. Terenzio.

11. Plaintiff, Thomas J. Sullivan, is a resident of Waltham, Massachusetts.  He brings this action as Personal Representative of the Estate of John J. Sullivan.

12. Plaintiff, Ed Poulin, is a resident of Nahant, Massachusetts.  He brings this action as Personal Representative of the Estate of Maurice C. Poulin.

13. Plaintiffs also bring this action on behalf of all of those similarly situated who were residents of the SHC in or after March 2020.

14. Defendant, Francisco Urena, is the former Secretary of the Massachusetts Department of Veterans' Services.  He is a resident of the Commonwealth of Massachusetts.

15. Defendant, Marylou Sudders, is the former Secretary of the Executive Office of Health and Human Services for the Commonwealth of Massachusetts.  She is a resident of the Commonwealth of Massachusetts.

16. Defendant, Cheryl Lussier Poppe, is the former Superintendent of the SHC.  She was appointed Superintendent in 2014.  She is a resident of the Commonwealth of Massachusetts.

17. Defendant, John Doe 1, is the former Medical Director of the SHC.  He is a resident of the Commonwealth of Massachusetts.

18. Defendant, Jane Doe 1, is the former Nursing Director of the SHC.  She is a resident of the Commonwealth of Massachusetts.

19. Defendant, Jane Doe 2, is an individual who was affiliated with the SHC in and about March of 2020 and participated in the management or supervision of residents and/or employees and staff of the SHC and living conditions at the SHC.

20. Defendant, John Doe 2, is an individual who was affiliated with the SHC in and about March of 2020 and participated in the management or supervision of residents and/or employees and staff of the SHC and living conditions at the SHC.

21. Defendants are sued in their individual capacities.

2726726.v1

## GENERAL ALLEGATIONS

### Background and the SHC

22. The SHC was established in 1882 to provide care and treatment to veterans who proudly served their country.

23. By 2020, the SHC consisted of a 139-bed long term care facility and 305-bed domiciliary.

24. The SHC has a Board of Directors appointed by the Secretary of the Executive Office of Health and Human Services.

25. In or about 2020, the long-term care portion of the SHC was an "open-ward," skilled nursing facility.

26. The residents at the SHC were housed in large, open, dormitory-style rooms throughout the building.

27. The Three-Center Unit was one of three (3) open-dormitory style units or rooms on the third floor of the SHC. There were approximately twelve beds in each of the three units – six (6) beds on each side of the three rooms. The following is a photograph that depicts a layout similar to the Three-Center unit as of early March 2020:

9



28. Although the door to the third-floor was locked, there was nothing preventing the residents of the three units from walking freely throughout the three units.

### Veterans Residing at the SHC

29. In March of 2020, Mr. Joseph Terenzio was a resident of the Three-Center Unit (third floor unit) at the SHC.

30. Mr. Terenzio had lived in the facility for approximately two years. His family visited Mr. Terenzio almost daily.

31. Mr. Terenzio was a decorated veteran and had earned numerous awards, including, a good conduct medal, two Bronze Stars, three Purple Heart and a Silver Star for saving the lives of twenty-seven (27) individuals during his service in the Asiatic Pacific Theater Campaign during World War II.  He was also wounded in action as a combat infantry rifleman and served as a Staff Sergeant.

32. In March of 2020, Mr. John J. Sullivan was also a resident of the Three-Center Unit at the SHC.

33. Mr. Sullivan had lived at the facility for more than a decade. His brother Tom Sullivan visited him whenever possible.

34. Prior to being moved into the Three-Center Unit at the SHC, Mr. Sullivan volunteered as an escort helping his fellow veterans in need to appointments at off-site VA medical centers.

35. Mr. Sullivan also served his country with distinction and valor as a member of the United States Navy during the Vietnam War.

36. Mr. Maurice Clement Poulin became a resident of the SHC in March of 2020. His family was very close to him.

37. Mr. Poulin had served in the United States Coast Guard for more than two decades and during the Korean War and Vietnam War.

38. He earned numerous awards and medals including the Navy Unit Commendation Ribbon, American Defense Service Medal, American Campaign Medal, US Coast Guard Good Conduct Medal with One Silver Star, the European-African-Middle Eastern Campaign Medal with Two Bronze Stars, the Asiatic-Pacific Campaign Medal with One Bronze Star and One Silver Star and the World War II Victory Medal.

39. At all relevant times, Mr. Terenzio, Mr. Sullivan, Mr. Poulin and their family members who entrusted these veterans' care to the SHC expected that they would be safe and protected at the SHC. They also relied on the defendants to provide for their safety and to keep them free from unnecessary injury or harm.

40. Numerous other veterans and war heroes resided at the SHC in and after March of 2020. They and their family members relied on the defendants to provide for their safety and to keep them free from unnecessary injury or harm.

## The COVID-19 Pandemic

41. On February 1, 2020, the Commonwealth of Massachusetts had its first confirmed case of COVID-19.

42. Prior to the start of the COVID-19 pandemic, there were clearly established guidelines for handling contagious diseases, such as COVID-19.

43. By mid-March 2020, there were more than 100 confirmed or presumptive cases of COVID-19 in the Commonwealth of Massachusetts.

44. On March 10, 2020, the Commonwealth of Massachusetts declared a state of emergency regarding the COVID-19 outbreak.

45. On March 11, 2020, the SHC used a forehead thermometer to take the temperature of any visitors who sought to enter the SHC and reported symptoms consistent with illness.

46. On March 12, 2020, the SHC stopped permitting visitors into the facility.

47. On March 13, 2020, the City of Boston announced that Boston Public Schools would be closed from March 17 until April 27, 2020

48. On March 15, 2020, the Commonwealth of Massachusetts ordered all schools (public and private) to close for three weeks (through April 7).

49. On March 19, 2020, the Commonwealth of Massachusetts activated up to 2,000 Massachusetts National Guards to assist in the management of the pandemic.

50. On or before March 19, 2020, a cafeteria worker at the SHC tested positive for COVID-19.

51. On March 23, 2020, the Commonwealth of Massachusetts announced a stay-at-home advisory effective from noon March 24 until noon April 7. Most businesses were ordered to close physical workplaces, and restaurants and bars were restricted to offering takeout and delivery.

52. On March 25, the Massachusetts Commissioner of Public Health issued emergency regulations for grocery stores and pharmacies, requiring them to designate a daily shopping hour for senior citizens and provide checkout line distancing markers, hand washing and sanitizer for employees, and disinfecting wipes for customers to use on carts.

### Defendants Were Deliberately Indifferent to the Rights of the Veterans

53. In or about mid-March 2020, the defendants, collectively and individually, knew or reasonably should have known of the significant risks associated with the COVID-19 virus.

2726726.v1

54. In and after March 2020, the defendants were responsible for ensuring for the safety and well-being of the veterans residing at the SHC, whose care had been entrusted to the SHC, and owed them each a duty of care.

55. The veterans residing at the SHC, including Mr. Terenzio, Mr. Sullivan, and Mr. Poulin, were confined to the SHC as result of their physical limitations and the effects of the COVID-19 pandemic.

56. Defendant Francisco Urena, Secretary of the Department of Veterans' Services, was responsible for overseeing the management and operation of the SHC and ensuring for the safety and well-being of the veterans residing at the SHC. He was also responsible for overseeing the hiring, training, and supervision of the individuals who were responsible for managing the SHC.

57. Defendant Marylou Sudders, Secretary of the Executive Office of Health and Human Services, was responsible for overseeing the management and operation of the SHC and ensuring for the safety and well-being of the veterans residing at the SHC. She was also responsible for overseeing the hiring, training, and supervision of the individuals who were responsible for managing the SHC.

58. Defendant Cheryl Lussier Poppe, Superintendent of the SHC, was responsible for overseeing the day-to-day management and operations of the SHC and ensuring for the safety and well-being of the veterans residing at the SHC. She was directly responsible for overseeing the hiring, training, and supervision of the supervisors and individuals working at the SHC and for establishing appropriate policy and procedures at the SHC.

59. Defendants, John Doe 1 and 2 and Jane Doe 1 and 2, were, in part, responsible for overseeing the day-to-day operations of the SHC and ensuring for the safety and well-being of the veterans residing at the SHC. They were also responsible for assisting in overseeing the supervisors and individuals working at the SHC and establishing appropriate policy and procedures at the SHC.  They were responsible for ensuring safe and sanitary living conditions at the SHC.

60. In and after March 2020, the defendants knew or should have known that many of the veterans who resided at the SHC were elderly and were particularly vulnerable to viruses, including the COVID-19 virus, as well as unsanitary living conditions.

61. At all relevant times, the defendants knew or understood that the deadly COVID-19 virus was spreading throughout Massachusetts.

62. At all relevant times, the defendants failed to adopt and/or implement appropriate protocols or procedures to address or mitigate the grave risks posed by the COVID-19 virus.

63. The defendants also failed to properly educate employees and residents of the SHC concerning the risks associated with the COVID-19 virus.

64. In the March 2020 edition of "The Hill," the official newsletter of the SHC, Defendant Superintendent Cheryl Lussier Poppe indicated "I am sure you have all been concerned about the impact of the coronavirus (COVD 19)."  However, Superintendent Poppe also stated "Remember, the risk of coronavirus is still considered low while the risk of flu is high."

65. The defendants failed to ensure that the employees and staff of the SHC had access to and wore necessary or appropriate PPE, including masks, gloves and gowns, so as to contain or mitigate the spread of COVID-19 within the SHC.

66. On one or more occasions, staff and/or employees at the SHC were actively discouraged from wearing PPE during their shifts.

67. In or about March of 2020, the situation regarding the lack of PPE at the SHC was particularly dire and, as a result, family members of the veterans living at the SHC were compelled to purchase PPE materials (including masks) and supply those materials to employees and staff at the SHC.

68. On one or more occasions, Mr. Terenzio's daughter, Brenda D'Errico, provided PPE materials she had purchased to Nancy Ansari, a CNA at the SHC.

69. The SHC was also given approximately 60 masks by the Holyoke Soldier's Home around this time.

70. The defendants failed to implement basic and well-known and clearly established infection control measures to prevent the spread of COVID-19 within the facility.

71. The defendants also knowingly permitted sick, ill or contagious employees or staff at the SHC to continue to work with the vulnerable veterans at the SHC.

72. The defendants also permitted employees or staff at the SHC to move between floors without determining whether these employees or staff were health risks to the veteran residents.

73. In and after March 2020, sick, ill or contagious employees were permitted to work with the vulnerable veteran population at the SHC.

14

74. In and after March 2020, the defendants failed to mandate or make arrangements for the testing or screening of employees and/or staff working at the SHC, including, nurses, CNAs and cafeteria or food preparation employees.

75. In or about March 2020, at least one employee of the SHC asked for a COVID-19 test but was told "no" by the SHC.

76. In or about March of 2020, there were no policies or procedures relating to testing or screening employees.

77. In or about March of 2020, sick, ill or contagious residents of the SHC, including residents on the third-floor, were not properly quarantined, isolated or separated from the other residents.

78. In or about March 2020, there was over-crowding within the dormitory-style units on the third-floor, and elsewhere in the SHC, resulting in social distancing well below clearly established guidelines.

79. In or about March of 2020, dementia residents on the third-floor were permitted to roam the floor and interact with other residents of the floor.

80. In or about March of 2020, at least one non-dementia resident of the third-floor was permitted to come and go from the unit as he wished.

81. In March of 2020 residents were permitted to congregate in a smoke shack outside the main building.

82. Even after the first residents of the SHC died from COVID-19, other residents were allowed to roam around the units and use the cafeteria.

83. After the first veteran resident of the SHC died from COVID-19, Maurice Poulin was moved from the locked 1-West ward where he resided so that this area could be used to house residents who had tested positive for COVID-19.

84. Mr. Poulin and the other residents who were moved from the locked 1-West ward were then moved to other areas on the floor, the 1-Center and 1-East wards.

85. This created over-crowding of the 1-Center and 1-East ward areas resulting in veteran residents living closer than the well-established and well-known social distancing recommendations and/or guidelines that existed at that time.

2726726.v1

86. Speandilove Nelson, a certified nurse assistant who had been working at the SHC for 16 years, stated that "there was no space. They took them from 6 feet and gave them 2 feet," "[t]here was no door blocking anybody from going anywhere. The ones that wander kept wandering, going up and down…."

87. By mid-April 2020, the SHC did not have proper procedures or protocols in place to isolate COVID-19 positive residents, and COVID-19 positive residents were not properly isolated.

88. Clearly established and well-known social distancing recommendations or guidelines were ignored or not enforced at the SHC.

89. Defendants failed to prevent or properly respond to an outbreak of the COVID-19 virus at the SHC.

90. Defendants also failed to take appropriate steps to prevent the spread of COVID-19 within the patient/resident population at the SHC.

91. On June 26, 2020, Senators Warren and Markey  requested that the Commonwealth of Massachusetts conduct an independent investigation concerning the outbreak of COVID-19 at the SHC.

92. To date, the Commonwealth of Massachusetts had not completed the requested independent investigation with respect to the deaths at the SHC.

### Defendants Failed to Address or Correct Unsafe, Unsanitary, and Unfit Living Conditions at the SHC

93. Veterans whose families entrusted them to the SHC were forced to live in conditions that were unsanitary and unsafe, and were provided far below the minimally adequate medical and nursing care to which these veterans were entitled due to the defendants' acts and omissions.

94. By way of example, Plaintiff Sullivan, who lived in the Quigley and Keville buildings during his time at SHC, was forced to live in areas where dirt, bugs, and roaches were present.

95. Plaintiff Sullivan was forced to use bed bug spray and roach spray and live in unsanitary conditions.

96. Other veteran residents of the SHC suffered similar unsanitary and unfit living conditions to those suffered by Plaintiff Sullivan.

2726726.v1

97. Many of the conditions later documented in Inspector General Jeffrey Shapiro's January 3, 2023 report to Secretary Sudders and elsewhere, were present from March 2020 onward.

98. As the Inspector General noted, a July 12, 2022 report by the Executive Office of Health and Human Services ("EHS") concluded that veterans at the home had been found lying "soaking in urine and sitting in feces" or "saturated in urine and double briefed."

99. The EHS report also concluded that nursing staff had failed to use proper equipment to move a patient "many times."

100. The January 3, 2023, report noted that the EHS report, and other reports the Inspector General reviewed, "paint a grim picture of the Home's treatment of the veterans who live there, and a concerning portrait of the superintendent's leadership and the work environment at the Home."

101. A senior member of Secretary Sudders' leadership team wrote that at least a dozen rooms in the SHC were in "terrible" condition, with feces, dead rodents, dirt and bugs present.

102. Even after visitation rights were resumed after being stopped on March 12, 2020, family members and other visitors of the veterans residing at the SHC have not been permitted to see their veterans' living conditions.

103. Under the defendants' guidance and supervision, the SHC also kept its veterans' medical records on paper, unlike virtually every other skilled nursing facility in the state, which used electronic record keeping.

104. Veterans' medical records were piled high on the floor, often in no particular order.

105. Indeed, when one veteran died from COVID-19 and the veteran's family needed his medical records to prove he died from COVID-19, it took the SHC weeks to locate the patient's records.

106. As one employee of the SHC stated, the records room "was utter disarray. It looked like a paper mill exploded."

107. In this, and other respects, the defendants failed to provide the veteran residents of the SHC with clearly established minimally adequate living conditions and forced the veterans at the SHC to live in unsafe and unsanitary conditions.

2726726.v1

**<u>Plaintiffs and Class Members Have Been Damaged</u>**

108. Plaintiffs and Class Members have suffered actual harm as a result of defendants' acts or omissions because they died, experienced pain, suffering, complications and/or required treatment as a result of COVID-19. Additionally, plaintiffs and Class Members experienced harm as a result of unsanitary, unsafe, and unfit conditions.

109. Because of defendants' acts or omissions, Mr. Terenzio contracted COVID-19 at the SHC, suffered needlessly, and later died from COVID-19 on Monday, March 30, 2020.

110. Because of defendants' acts or omissions, two other veterans residing at the SHC contracted COVID-19 at the SHC, suffered needlessly, and later died from COVID-19 by April 4, 2020.

111. As of April 4, 2020, fourteen (14) veterans and six (6) employees had contracted the COVID-19 virus.

112. Because of defendants' acts or omissions, Mr. Sullivan contracted COVID-19 at the SHC, suffered needlessly, and later died from COVID-19 on April 7, 2020 at the West Roxbury VA.

113. Because of defendants' acts or omissions, at least five (5) veterans had contracted COVID-19 at the SHC, suffered needlessly, and later died from COVID-19 by April 10, 2020.

114. As of April 10, 2020, twenty-seven (27) veterans and twenty-nine (29) employees of the SHC had contracted the COVID-19 virus.

115. Because of defendants' acts or omissions, Mr. Poulin contracted COVID-19 at the SHC, suffered needlessly, and later died from COVID-19 on April 23, 2020 at the West Roxbury VA.

116. Because of defendants' acts or omissions, at least twenty-eight (28) other similarly situated veterans at the SHC contracted COVID-19 at the SHC, suffered needlessly, and later died from COVID-19 by June 10, 2020.

117. Because of defendants' acts or omissions, numerous veterans residing at the SHC contracted COVID-19, required care and treatment and/or experienced pain or suffering.

2726726.v1

118. By May 22, 2020, a total of sixty-seven (67) veterans had contracted COVID-19 at the SHC.

119. Between February 2020 and May 8, 2020, VA medical centers in Boston and Bedford accepted at least forty (40) residents of SHC for care from COVID-19 related issues.

120. From March 1, 2020, to the present, the veterans residing at the SHC, including Mr. Terenzio, Mr. Sullivan, and Mr. Poulin, suffered harm as a result of the unsanitary and unsafe conditions caused by the defendants' acts and omissions.

121. From March 1, 2020, to the present, the veterans residing at the SHC, including Mr. Terenzio, Mr. Sullivan, and Mr. Poulin, suffered harm as a result of being provided with less than the clearly established, minimally acceptable services and living conditions as a result of the defendants' acts and omissions.

122. The injuries sustained by plaintiffs, Mr. Terenzio, Mr. Sullivan, and Mr. Poulin, and the Class Members flow from the common facts surrounding defendants' misconduct.

123. The damages suffered by plaintiffs, Mr. Terenzio, Mr. Sullivan, and Mr. Poulin, and the Class Members include unnecessary pain, suffering, loss, personal humiliation, mental anguish, mental and emotional distress, and death. The plaintiffs and Class Members are entitled to compensatory and punitive damages

## CLASS ACTION ALLEGATIONS

124. Plaintiffs bring all claims individually and pursuant to Fed. R. Civ. P. 23. The requirements of Fed. R. Civ. P. 23(a) and (b)(3) are met with respect to the Classes defined below.

125. Plaintiffs propose a Rule 23(b)(3) "Damages Class" defined as follows:

> All persons who resided at the SHC from March 1, 2020 to the present who: 1) died premature and preventable deaths from COVID-19 because they had been residing at the SHC, and/or 2) contracted COVID-19 because they had been residing at the SHC and experienced pain and suffering and/or received care and treatment for their conditions, and/or 3) suffered harm as a result of the unsanitary, unfit, and unacceptable living conditions at the SHC.

2726726.v1

126. Excluded from the Class is any class member who has entered into a binding release for their claim with defendants and/or is barred from bringing a claim due to a judgment entered in a court of law pursuant to the doctrines of res judicata and/or collateral estoppel.

## **RULE 23(a) and (b)(3) CRITERIA**

127. <u>Numerosity</u>: Plaintiffs are informed and believe that defendants are aware of at least thirty-one (31) other potential claims involving residents who died from COVID-19. Additionally, Plaintiffs understand that there are numerous other residents who contracted COVID-19 and experienced pain and suffering and/or received care and treatment for their conditions. Additionally, Plaintiffs understand that there are numerous other residents who suffered harm as a result of the unsanitary, unfit, and unacceptable services and living conditions at the SHC.  Accordingly, the Classes consist of, at minimum, forty (40), making joinder of all Class members impracticable.

128. <u>Commonality</u>: Questions of law and fact are common to the Plaintiffs and the Damages Class, and predominate over questions affecting only individual members, including, inter alia, the following:

      a. Whether the defendants were recklessly indifferent and violated Federal Law; and

      b. Whether the plaintiffs and the members of the Damages Classes are entitled to damages.

129. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class described above, and arise from the same course of conduct by the defendants. The relief plaintiffs seek is typical of the relief sought for the absent Class Members.

130. <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of all absent Class Members. Plaintiffs are represented by counsel competent and experienced in class action litigation.

131. <u>The prerequisites of Rule 23(b)(3), Predominance and Superiority, are Satisfied for the Damages Classes</u>: Plaintiffs and the Class have all suffered damages as a result of the defendants' acts or omissions. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Moreover, absent a class action, most Class Members would likely find the

cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

132. The prosecution of separate actions by the individual Class Members would create a risk of inconsistent and varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

133. Defendants' actions are generally applicable to the Class as a whole, and plaintiffs seek damages on behalf of (b)(3) classes.

## CAUSES OF ACTION
### COUNT I
### FOURTEENTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983

134. The plaintiffs repeat and reallege the allegations contained in the preceding paragraphs, as if expressly re-written and set forth herein.

135. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law."

136. Defendants' acts and omissions were under the color of state law.

137. The defendants violated the rights of the plaintiffs, and other similarly situated veterans who resided at the SHC, by failing to protect them from harm, creating unsafe conditions of confinement for the veterans at the SHC, failing to provide them with a safe environment, depriving them of minimally adequate services and living conditions, and/or exposing them to harm.

138. In and after March of 2020, the defendants were obligated to protect, supervise and provide appropriate services and living conditions for the veterans who resided at the SHC.

139. The defendants were recklessly indifferent to the needs and constitutional rights of Mr. Terenzio, Mr. Sullivan, Mr. Poulin and their fellow veterans at the SHC.

140. The defendants, individually and collectively, failed to take timely or appropriate actions with respect to the deadly and contagious COVID-19 virus and demonstrated callous indifference to the rights of the veterans under the care of the SHC in and after March 2020.

141. The defendants' reckless indifference included the following egregious and callous acts or omissions:

   a. Failing to properly consider and respond to the risks associated with the COVID-19 virus;
   b. Failing to adopt and/or implement appropriate protocols or procedures to address or mitigate the grave risks posed by the COVID-19 virus;
   c. Failing to properly educate employees and residents of the SHC concerning the risks associated with the COVID-19 virus;
   d. Failing to prevent or properly respond to an outbreak of the COVID-19 virus at the SHC;
   e. Failing to take appropriate steps to prevent the spread of COVID-19 within the patient/resident population at the SHC;
   f. Failing to ensure that the employees or staff of the SHC had appropriate PPE (including masks, gloves and gowns);
   g. Failing to ensure that sick, ill or contagious employees or staff at the SHC were quarantined or denied admission to the SHC;
   h. Allowing sick, ill or contagious employees or staff to continue to work at the SHC;
   i. Failing to test or screen employees or staff working at the SHC;
   j. Failing to properly test or screen visitors to the SHC;
   k. Failing to ensure that sick, ill or contagious residents and/or family members of residents at SHC were quarantined or denied admission to the SHC;
   l. Allowing sick, ill or contagious residents to live and sleep in close proximity to other residents at the SHC and have unrestricted access to their units;
   m. Disregarding industry and/or governmental advice and recommendations, including, but not limited to, Center for Disease Control and Prevention (CDC) COVID-19 protocols and guidance;
   n. Forcing dementia residents to live and sleep in close proximity to other non-dementia residents at the SHC;
   o. Failing to implement or adopt appropriate infection control and/or crisis management procedures or protocols;
   p. Failing to ensure that there was adequate staffing at the SHC;
   q. Creating and maintaining an unsanitary, unfit, and unacceptable services and living conditions;
   r. Creating unsafe conditions of confinement for the veterans at the SHC;
   s. Failing to provide the veterans at SHC with minimally adequate living conditions; and

    t.  Otherwise failing to ensure for the care, safety, and protection of the veterans residing at the SHC.

142.  The defendants' acts and omissions shock the conscience, were done with deliberate indifference, and constituted deliberate disregard for the health, safety, and federal rights of the veterans of the SHC.

143.  Pursuant to 42 U.S.C. § 1983, the plaintiffs and all others similarly situated who either died as a result of COVID-19 or were infected by COVID-19 or suffered harm as a result of the unsafe conditions at the SHC are entitled to compensatory and punitive damages.

WHEREFORE, plaintiffs and putative Class Members demand judgment against defendants in an amount that will adequately compensate plaintiffs and the putative Class Members for their losses, together with interest, fees and costs.

## DEMANDS FOR RELIEF

WHEREFORE, plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter a judgment against defendants and in favor of plaintiffs, and grant the following relief:

1.  Determine that this action may be maintained as a class action with respect to the classes identified herein; certify a class action pursuant to both Rules 23(b)(3) with respect to particular issues if appropriate; and designate and appoint the named plaintiffs herein and their counsel to serve as Class Representative and Class counsel;

2.  Grant plaintiffs and the Rule 23(b)(3) Damages Class awards of damages in such amount to be determined at trial or as provided by applicable law;

3.  Grant the plaintiffs and members of the Class their costs of suit, including reasonable attorneys' fees, and expenses, as provided by law; and

4.  Grant the plaintiffs and the members of the Class such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

The plaintiffs hereby demand a trial by jury on all claims so triable.

Respectfully Submitted,
Plaintiffs,
By their attorneys,

*/s/ John A. Donovan III*

_____

Anthony J. Antonellis, BBO #557964
John A. Donovan III, BBO #631110
Christopher M. Reilly, BBO#674041
Sloane and Walsh, LLP
201 Washington Street, Ste. 1600
Boston, MA 02108
617-523-6010
aantonellis@sloanewalsh.com
jdonovan@sloanewalsh.com
creilly@sloanewalsh.com

Dated:  February 27, 2023

2726726.v1