UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DELMA TERENZIO, as Personal Representative of the Estate of Joseph A. Terenzio; THOMAS SULLIVAN, as Personal Representative of the Estate of John J. Sullivan; and EDWARD POULIN, as Personal Representative of the Estate of Maurice C. Poulin, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br>       v.<br><br>FRANCISCO URENA, MARYLOU SUDDERS, CHERYL LUSSIER POPPE, JOHN DOE 1, JANE DOE 1, JOHN DOE 2, and JANE DOE 2,<br><br>    Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*  Civil Action No. 1:23-cv-10462-IT<br>*<br>*<br>*<br>*<br>*<br>*<br>* |

MEMORANDUM & ORDER

February 12, 2024

TALWANI, D.J.

    This action concerns COVID-19 related deaths and unsafe living conditions at the Soldiers' Home in Chelsea, Massachusetts, a long-term care facility for veterans. According to the Amended Complaint ("Complaint") [Doc. No. 6], Veterans Joseph A. Terenzio, John J. Sullivan, and Maurice C. Poulin died after contracting COVID-19 at the Soldiers' Home. Plaintiffs Delma Terenzio, Thomas Sullivan, and Edward Poulin, as the personal representatives of the three veterans, bring this Section 1983 action on behalf of themselves and a putative class of similarly situated individuals. Plaintiffs allege that Defendants Francisco Urena, Marylou Sudders, Cheryl Lussier Poppe, and four unnamed Defendants violated the veterans' Fourteenth Amendment rights to substantive due process by mismanaging the long-term care facility's COVID-19 response and by subjecting the veterans to unsanitary, unsafe, and inhumane living

conditions. Plaintiffs seek damages from Defendants in their individual capacities. Urena, Sudders, and Poppe filed a Motion to Dismiss [Doc. No. 20] the Amended Complaint. For the reasons set forth herein, the Motion is GRANTED.

**I.     Facts as Alleged in the Complaint**

   A.    *Background*

When the time the events at issue here commenced, Veterans Terenzio, Sullivan, and Poulin were residents of the Soldiers' Home. Terenzio, who served during World War II, had lived at the Soldiers' Home for approximately two years, Am. Compl. ¶¶ 30-31 [Doc. No. 6]; Sullivan, who served during the Vietnam War, had lived there for over a decade, id. ¶¶ 33, 35; and Poulin, who served during the Korean and Vietnam Wars, became a resident in March of 2020, id. ¶¶ 36-37.

The Defendants were all state employees. Urena was the Massachusetts Secretary of the Department of Veterans' Affairs; Sudders was the Massachusetts Secretary of the Executive Office of Health and Human Services; Poppe was the Superintendent of the Soldiers' Home; John Doe 1 was the Medical Director of the Soldiers' Home; and Jane Doe 1 was the Nursing Director of the Soldiers' Home. Id. ¶¶ 14-18. Defendants Jane Doe 2 and John Doe 2 "participated in the management or supervision of residents and/or employees and staff at the [Soldiers' Home]." Id. ¶¶ 19-20.

   B.    *The COVID-19 Pandemic and the Veterans' Deaths*

On February 1, 2020, Massachusetts had its first confirmed case of COVID-19, and by March 10, 2020, Massachusetts had declared a state of emergency regarding the COVID-19 outbreak. Id. ¶¶ 63, 66. COVID-19 was detected at the Soldiers' Home by mid-March, id. ¶ 73,

but during a monthlong period (from March 2020 to mid-April 2020), Defendants[1] failed to take proper protective measures to prevent the spread of the virus. Defendants failed to provide or encourage the use of adequate personal protective equipment ("PPE"), such as masks, gowns, and gloves. Id. ¶¶ 84-85. Defendants failed to promptly implement temperature checks or COVID-19 testing protocols. Id. ¶¶ 86, 94. Defendants knowingly permitted sick or ill employees to work at the Soldiers' Home. Id. ¶ 91. Defendants permitted sick veterans to be housed with healthy veterans. Id. ¶¶ 97-99. When COVID-19 began spreading to the residents of the Soldiers' Home, Defendants moved veterans to overcrowded quarters, and continued to allow residents and employees to freely roam around the units and the cafeteria. Id. ¶¶ 92, 100-103.

After contracting COVID-19 in the Soldiers' Home, Veterans Terenzio, Sullivan, and Poulin died on March 30, April 7, and April 23, 2020, respectively. Id. ¶¶ 143, 146, 149. At least twenty-eight other veterans who resided at the Soldiers' Home died from the disease by June 10, 2020. Id. at ¶ 150.

    C.    *The Soldiers' Home Living Conditions*

Separate from the COVID-19 pandemic, the Soldiers' Home was subjecting its veterans to egregious living conditions. Id. ¶ 121. Many conditions that were later documented in investigations were also present in the Soldiers' Home prior to those investigations, including in March 2020. Id. ¶ 125. Prior to his passing, Sullivan was forced to use roach spray and bed-bug spray and to live in unsanitary conditions. Id. ¶ 123. Terenzio, Sullivan, and Poulin endured discomfort, distress, humiliation, and unnecessary pain as a result of these conditions. Id. ¶¶ 154, 156, 158.

---

[1] Except as specifically noted below, the Complaint refers to "Defendants" (including Defendants John and Jane Does) collectively.

A July 12, 2022 Executive Office of Health and Human Services ("EHS") report (the "2022 Report") documented that veterans at the home had been found lying "soaking in urine and sitting in feces," "saturated in urine and double briefed," and left in soaked and dirtied diapers for extended periods of time. Id. ¶¶ 126-127. A January 3, 2023 EHS report (the "2023 Report") documented that at least a dozen Soldiers' Home rooms were in "terrible" condition, "with feces, dead rodents, dirt and bugs present." Id. ¶ 130. The Soldiers' Home also moved veterans using improper equipment, id. ¶ 128, improperly restrained the veterans, id. ¶ 135, and kept veterans' medical records in a state of such disarray that the report described the records room as looking "like a paper mill exploded," id. ¶ 137.

## II.   Standard of Review

In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In addition, "an adequate complaint must include not only a plausible claim but also a plausible defendant." See Penalbert-Rosa v. Fortuno-Burset, 631 F.3d 592, 594 (1st Cir. 2011).

The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). When a public official asserts a qualified immunity defense, courts engage in a two-part inquiry, asking (1) whether the facts alleged by the plaintiff make out a violation of a constitutionally protected right, and (2) whether, at the time of the defendant's alleged violation, the right at issue was clearly established such that a reasonable officer would have known that his or her conduct violated that right. See Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009).

On the first prong, as to a constitutionally protected right, the Due Process Clause "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm, nor does it guarantee due care by government officials." DePoutot v. Rafaelly, 424 F.3d 112, 118 (1st Cir. 2005) (internal quotation marks omitted). Rather, for a substantive due process claim, plaintiffs must show that "they suffered the deprivation of an established life, liberty, or property interest, *and* that such deprivation occurred through governmental action that shocks the conscience." Clark v. Boscher, 514 F.3d 107, 112 (1st Cir. 2008). "[A] hallmark of successful [due process] challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011) (internal quotation marks omitted).

The second qualified immunity prong has two aspects: "(1) the relative clarity of the governing law to a reasonable official on the date of the alleged wrong and (2) whether the specific characteristics of the situation confronted by the official would have made it clear to a reasonable official how the governing law applied in the given situation." Lawless v. Town of Freetown, 63 F.4th 61, 67 (1st Cir. 2023). The court may address either prong of the qualified immunity analysis first. Ablordeppey v. Walsh, 85 F.4th 27, 33 (1st Cir. 2023).[2]

### III. Discussion

#### A. *COVID-19 Deaths*

Plaintiffs allege that Defendants "failed to adopt and/or implement appropriate protocols or procedures to address or mitigate the grave risks posed by the COVID-19 virus" during the relevant time period. Am. Compl. ¶ 81 [Doc. No. 6].[3] Plaintiffs contend that as a result of Defendants' conduct, at least thirty-one veterans—including Joseph A. Terenzio, John J. Sullivan, and Maurice C. Poulin—contracted COVID-19 during the first month or so of the pandemic and lost their lives shortly thereafter. Id. ¶¶ 143, 146, 149, 150.

Defendants do not dispute that Terenzio, Sullivan, and Poulin were deprived of a constitutionally protected right when they contracted fatal cases of COVID-19 at the Soldiers' Home. Instead, they argue first that the veterans were not harmed by any affirmative actions taken by the Defendants, but by COVID-19. This argument distorts the causation standard required in a Section 1983 case: while Terenzio, Sullivan, and Poulin ultimately succumbed to

---

[2] While a court has this choice, not addressing the first prong—whether or not the conduct in question amounts to a constitutional violation—leaves the law unsettled and provides little guidance for state officials with respect to their constitutional obligations.

[3] Plaintiffs' other COVID-related allegations are subsets of this general allegation, including a failure to properly educate staff and residents on the dangers of COVID-19, id. ¶ 82, and a failure to ensure that staff had access to proper PPE, id. ¶ 84.

6

COVID 19, the Complaint alleges that it was the Defendants who put the veterans in vulnerable, unsafe situations such that they contracted the disease in the first place. See, e.g., Woodson v. City of Richmond, Virginia, 88 F. Supp. 3d 551, 569 (E.D. Va. 2015) ("[A] reasonable jury could determine that [a state official's] failure to appropriately mitigate the inmates' severe heat exposure directly, affirmatively caused [plaintiff's] injuries that w[ere] caused by heat exposure."). The Defendants' reasoning also ignores the portions of Plaintiffs' Complaint that articulate specific affirmative actions by the Defendants that increased the risk of COVID-19 infection. See Am. Compl. ¶¶ 97-99 (housing sick residents with healthy ones); ¶ 109 (placing residents in beds less than two feet apart); ¶¶ 100-103 (permitting sick residents to freely roam the units and common spaces) [Doc. No. 6].

In the alternative, Defendants argue that their conduct with respect to managing the COVID-19 pandemic did not "shock the conscience" under the second prong of the substantive due process test. They contend that because the COVID-19 pandemic was an exigent circumstance, their actions do not rise to the level of "truly outrageous, uncivilized, and intolerable" conduct that would constitute a due process violation. See Def.'s Mem. ISO MTD 9 (citing Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006)) [Doc. No. 21]. It is true that certain allegations in the Plaintiffs' Complaint, when viewed in the light of the uncertainty surrounding COVID-19 in March 2020, do not amount to conscience-shocking behavior. For instance, the allegation that Defendants failed to ensure the availability of masks in March 2020 does not shock the conscience where the federal Center for Disease Control did not recommend the use of face coverings in public until April 3, 2020. See generally CDC Museum COVID-19 Timeline (March 15, 2023), https://www.cdc.gov/museum/timeline/covid19.html. In the same vein, COVID-19 rapid tests were not available in March 2020, nor were vaccines. Id. Thus, where

7

Plaintiffs have alleged that a failure to wear PPE or a failure to provide COVID-19 tests amount to substantive due process violations, the allegations are insufficient.

But where Plaintiffs have alleged affirmative actions that run contrary to basic, long-established understandings regarding infectious disease control and mitigation, those may well rise to the level of conscience-shocking behavior. See Coyne v. Cronin, 386 F.3d 280, 288 (1st Cir. 2004). These acts include placing sick veterans in beds less than two feet apart; housing all sick veterans together in one ward; permitting (and even encouraging) sick employees to report to the workplace; and permitting veterans to roam freely between isolated and non-isolated wards. Thus, the Plaintiffs have sufficiently alleged conduct that a jury could find amounted to conscience-shocking behavior.

Plaintiffs' claim nonetheless fails as pleaded here. In a Section 1983 case, a plaintiff must also show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft, 556 U.S. at 676. Moreover, in analyzing qualified immunity, a court errs when it "[does] not analyze the specific facts alleged against the [defendant], but incorrectly focuse[s] instead on the acts of the 'government officials.'" Maldonado v. Fontanes, 568 F.3d 263, 273 n.5 (1st Cir. 2009). Defendants are correct that Plaintiffs' generalized allegations fail to specify how any individual Defendant was involved in the alleged misconduct, as is required for a Section 1983 claim. In the absence of specific allegations that individual Defendants have acted in a truly outrageous way, Plaintiffs' Section 1983 claim as to the COVID-19 related due process violations must therefore fail on both prongs of the qualified immunity analysis.[4]

---

[4] Defendants point to the First Circuit's decision in in Ablordeppey as foreclosing Plaintiffs' claims. 85 F.4th 27. In Ablordeppey, the First Circuit found that in the context of a "rapidly evolving" global pandemic, appellees in another Soldiers' Home case were entitled to qualified

B.   *Safe and Humane Living Environment*

1.   Constitutional Right

Defendants argue that because the veterans were voluntary residents of the Soldiers' Home, the state was under no constitutional obligation to provide a certain standard of living condition to the veterans.

It is well established that individuals *involuntarily* committed to state care and custody have a constitutionally protected right to "reasonable conditions of safety." Youngberg v. Romero, 457 U.S. 307, 321 (1982); id. at 315-316 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed—who may not be punished at all—in unsafe conditions."). Relying on Youngberg, the First Circuit has contemplated situations in which that constitutionally protected right might extend to a *voluntarily* committed individual: in particular, where a plaintiff can establish "a sufficient combination of helplessness on the part of the [plaintiff], and wanton callousness on the part of those caring for [the plaintiff], [the] case might cross the line from tort to a § 1983 case." Harper v. Cserr, 544 F.2d 1121, 1124 (1st Cir. 1976); see also Goodman v. Parwatikar, 570 F.2d 801, 804 (8th Cir. 1978) (citing Harper for proposition that once a state admits a relatively helpless patient, "voluntar[il]y or involuntar[il]y, [that patient] ha[s] a constitutional right to a basically safe and humane living environment"). Thus, where a plaintiff can demonstrate both that their confinement in a state institution is de facto involuntary, and that the state official acted with reckless disregard with respect to that

---

immunity. Id. at 34. Plaintiffs argue that Ablordeppey, which involved an employee who did not contract COVID-19, is distinguishable on various grounds. The court agrees that the cases are distinguishable, but as set forth above, in the absence of individualized allegations as to the individual Defendants, the claim nonetheless fails.

9

plaintiff's well-being, the state may be found to have assumed a due process obligation as to that plaintiff.

Defendants argue that Monahan v. Dorchester Couns. Ctr., Inc. imposes an additional burden on a Plaintiff to show that the state has taken "an 'affirmative act' which 'restrain[s] the individual's freedom to act on his own behalf.'" 961 F.2d 987, 992 (1st Cir. 1992). The plaintiff in Monahan, however, did not satisfy the Harper test because that plaintiff was alleging "*negligent* harm done by state caretakers." Id. at 992 (emphasis added). But Plaintiffs here have alleged Defendants' failure to rectify the egregious living conditions at the Soldiers' Home extended beyond mere negligence. E.g., Am. Compl. ¶ 174 (alleging reckless indifference on part of Defendants) [Doc. No. 6].

As a result, the First Circuit's Harper test is applicable to Plaintiffs' constitutional claims. Harper held that "the [due process] rationale applicable to involuntary committed patients might possibly apply to some voluntary mental patients because, 'depending on [their] degree of disability, the availability of other resources and of parents, spouses, friends and guardians . . . [voluntary patients] may or may not be compelled de facto to endure the conditions at a state facility.'" Monahan, 961 F.2d at 992 (quoting Harper, 544 F.2d at 1123).

Here, the veterans allegedly "were confined to the [Soldiers' Home] as a result of their physical limitations and the effects of the COVID-19 pandemic." Am. Compl ¶ 78 [Doc. No. 6]. As of March 2020, Mr. Terenzio, a World War II veteran, had been a resident of the Soldiers' Home for approximately two years, id. ¶ 30, and Mr. Sullivan had been a resident of the facility for over a decade, id. at ¶ 33.[5] These allegations are sufficient to plausibly suggest that these

---

[5] Defendants suggest that the length of time a patient spends in a residential state facility is untethered to this inquiry, Def. Rep. 9 n.8 [Doc. No. 29], but time spent at a state-run living facility is one of several related factors (e.g., outside support, independent caretaking ability, and

veterans were "de facto" involuntary residents of the Soldiers' Home such that the state was required to ensure a certain standard of safe and humane living conditions. Thus, the court turns to the substance of Plaintiffs' allegations.

Plaintiffs allege that veterans at the Soldiers' Home were forced to live in egregiously unsanitary and unsafe conditions unrelated to the COVID-19 pandemic, and that these conditions violated the veterans' substantive due process rights. These conditions include: leaving veterans to lie in their own feces and urine; moving veterans using improper equipment; housing veterans in rooms where roaches and rodents were present; and failing to maintain adequate or organized medical records for the veterans.

In response, Defendants argue that the Complaint does not sufficiently allege that Veterans Terenzio, Sullivan, and Poulin suffered harm as a result of the alleged conditions at the Soldiers' home. Def. Mem. MTD 4 [Doc. No. 21]. Here, the court agrees. With the exception of one allegation that Sullivan was forced to use roach spray and bed bug spray while he was a resident, the Complaint does not contain any specifics as to the conditions and/or types of harm allegedly experienced by the named veterans due to the non-COVID related issues. Am. Compl. ¶ 123 [Doc. No. 6]; see id. ¶ 125 (general allegation that conditions documented in 2022/2023 reports were present in 2020); ¶¶ 154, 156, 158 (allegations that each named veteran experienced discomfort and distress due to the general unsanitary conditions). These allegations are insufficient to state a claim that the named veterans, who all died in March or April 2020, endured living conditions at the Soldiers' Home similar to those documented in the 2022 and 2023 Reports.

---

"physical limitations") that demonstrate whether or not the veterans were capable of leaving the facility. Cf. Monahan, 961 F.2d at 992 (referencing six-day stay of patient as factor weighing against involuntariness of confinement).

11

      2.      Controlling Authority Sufficient to Put the Officer on Notice

Under the second prong of the qualified immunity analysis, the plaintiff must (1) identify either controlling authority or a consensus of persuasive authority sufficient to put the officer on notice that his conduct fell short of the constitutional norm and (2) demonstrate that an objectively reasonable officer would have known that his conduct violated the law. Conlogue v. Hamilton, 906 F.3d 150, 155 (1st Cir. 2018). The Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality," Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)), and that "specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts,'" id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). So, although a plaintiff need not point to applicable precedent when "the unlawfulness of the officer's conduct is sufficiently clear," Dist. of Columbia v. Wesby, 583 U.S. 48, 64 (2018), "existing precedent must have placed the statutory or constitutional question beyond debate," White v. Pauly, 580 U.S. 73, 79 (2017) (quoting Mullenix, 577 U.S. at 12). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." Id. (internal quotation marks and citation omitted).

Both the Supreme Court and the First Circuit have spoken to the fact that subjecting individuals involuntarily confined to state care to unreasonably unsafe living conditions is conduct that constitutes a constitutional violation. See, e.g., Youngberg v. Romeo, 457 U.S. 307 (1982); Harper v. Cserr, 544 F.2d 1121 (1st Cir. 1976). Thus, the conditions the veterans were allegedly subjected to—"soaking in urine and sitting in feces," "saturated in urine and double briefed," for "extended periods of time," Am. Compl. ¶¶ 126-127 [Doc. No. 6], and living in

rooms with "feces, dead rodents, dirt and bugs present," id. ¶ 130—would have undeniably violated the Constitution if the Soldiers' Home veterans had been clearly (and properly) classified as involuntary residents in 2020. See Taylor v. Riojas, 592 U.S. 7, 9-10 (2020) ("[N]o reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time."); see also Laaman v. Helgemoe, 437 F. Supp. 269, 308-9 (D.N.H. 1977) ("Unsanitary and inadequate conditions have been universally condemned where they pose a threat to health and safety . . . . If inadequate and filthy, such conditions have been found constitutionally intolerable under any theory."). But with regard to the Soldiers' Home living conditions, Defendants are correct that there was no clearly established controlling authority with respect to whether physically limited, long-term residents are de facto involuntary wards of a state-run facility.

### IV.    Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. No. 20] is GRANTED.

IT IS SO ORDERED

February 12, 2024                                          /s/     Indira Talwani
                                                          United States District Judge